1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JENNER & BLOCK LLP
Andrew J. Thomas (SBN 159533)
ajthomas@jenner.com
David R. Singer (SBN 204699)
dsinger@jenner.com
Lisa J. Kohn (SBN 260236)
lkohn@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone:  (213) 239-5100
Facsimile:   (213) 239-5199

Attorneys for Plaintiffs
Fifty Shades Limited and
Universal City Studios LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIFTY SHADES LIMITED, a United Kingdom private company; and UNIVERSAL CITY STUDIOS LLC, a Delaware limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> SMASH PICTURES, INC., a California corporation; LUV MOVES, a business entity of unknown form; DANIEL QUINN, an individual; STUART WALL, an individual; JAMES LANE aka JIM POWERS, an individual; RIGHT ASCENSION, INC., d/b/a ADULT DVD EMPIRE, a Pennsylvania corporation; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.  CV 12-10111-PSG (SHx) <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> Hearing Date:  April 1, 2013 <br> Hearing Time:  1:30 p.m. <br> Courtroom:      880 - Roybal Building |

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................... 1

II.  FACTUAL BACKGROUND ................................................................ 2

    A.  The Fifty Shades Trilogy ............................................................. 2

    B.  Universal's Exclusive Motion Picture Rights ......................... 3

    C.  Defendants' Infringing Adaptation ........................................... 4

III.  ARGUMENT ........................................................................................ 4

    A.  Plaintiffs Will Prevail On Their Copyright Infringement
       Claim ............................................................................................. 5

        1.  Defendants Admit They Copied The Fifty Shades
           Trilogy .................................................................................. 6

        2.  The XXX Adaptation Is Substantially Similar To
           *Fifty Shades Of Grey* And *Fifty Shades Darker* ...... 8

           a.  Application of the Extrinsic Test ......................... 8

           b.  Application of the Intrinsic Test......................... 14

        3.  The XXX Adaptation Is Not A Fair Use....................... 15

           a.  The Purpose and Character of the Use............... 16

           b.  The Nature of the Copyrighted Work ............... 18

           c.  The Amount and Substantiality of the Portion
              Used. ..................................................................... 18

           d.  The Impact on the Actual or Potential Market .............. 18

    B.  Plaintiffs Will Suffer Irreparable Harm Absent An
       Injunction.................................................................................... 20

        1.  The XXX Adaptation Will Damage Goodwill In The
           Trilogy ................................................................................ 21

        2.  The XXX Adaptation Will Result In Incalculable
           Lost Profits ........................................................................ 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

C.   The Balance Of Hardships Weighs Decidedly In Favor Of
Plaintiffs ................................................................................... 24

D.   Public Policy Favors The Issuance Of A Preliminary
Injunction ................................................................................. 25

IV.   CONCLUSION ............................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A&M Records, Inc. v. Napster, Inc.*,
 239 F.3d 1004 (9th Cir. 2001) ...................................................................5, 16, 19

*Alliance for the Wild Rockies v. Cottrell*,
 632 F.3d 1127 (9th Cir. 2011) .................................................................................5

*Amini Innovation Corp. v. KTY Int'l Mkt'g*,
 768 F. Supp. 2d 1049 (C.D. Cal. 2011) ........................................................21, 23

*Apple Inc. v. Psystar Corp*,
 673 F. Supp. 2d 943 (N.D. Cal. 2009) ..........................................................21, 23

*Benny v. Loew's, Inc.*,
 239 F.2d 532 (9th Cir. 1956) ................................................................................12

*Berster Tech. v. Christmas*,
 2012 WL 33031 (E.D. Cal. Jan. 6, 2012) ............................................................22

*Bradbury v. Columbia Broadcasting System, Inc.*,
 287 F.2d 478 (9th Cir. 1961) ........................................................................14, 15

*Broderbund Software, Inc. v. Unison World, Inc.*,
 648 F. Supp. 1127 (N.D. Cal. 1986) .......................................................................6

*Cadence Design Sys., Inc. v. Avant! Corp.*,
 125 F.3d 824 (9th Cir. 1997) ................................................................................24

*California v. Tahoe Regional Planning Comm'n*,
 766 F.2d 1319 (9th Cir. 1985) ..............................................................................25

*Campbell v. Acuff-Rose Music, Inc.*,
 510 U.S. 569 (1994) .......................................................................16, 17, 18, 20

*Castle Rock Entm't v. Carol Publ'g Group*,
 150 F.3d 132 (2d Cir. 1998) ..........................................................................16, 17

*Cavalier v. Random House, Inc.*,
 297 F.3d 815 (9th Cir. 2002) ..................................................................................8

*Colin ex rel. Colin v. Orange Unified Sch. Dist*,
   83 F. Supp. 2d 1135 (C.D. Cal. 2000) ................................................................. 25

*Columbia Pictures Indus. v. Miramax Films Corp.*,
   11 F. Supp. 2d 1179 (C.D. Cal. 1998) ......................................................... 14, 17

*Data East USA, Inc. v. Epyx, Inc.*,
   862 F.2d 204 (9th Cir. 1988) .............................................................................. 6

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
   109 F.3d 1394 (9th Cir. 1997) ......................................................... 16, 17, 18

*Eldred v. Ashcroft*,
   537 U.S. 186 (2003) ......................................................................................... 25

*Harper & Row, Publrs. v. Nation Enters.*
   471 U.S. 539(1985) .......................................................................................... 19

*Kalem Co. v. Harper Bros.*,
   222 U.S. 55 (1911) ............................................................................................. 5

*M. Kramer Mfg. Co., Inc. v. Andrews*,
   783 F.2d 421 (4th Cir. 1986) .......................................................................... 6, 8

*Metcalf v. Bochco*,
   294 F.3d 1069 (9th Cir. 2002) ........................................................................ 13

*Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co.*,
   900 F. Supp. 1287 (C.D. Cal. 1995) ............................................................ 9, 19

*Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Cooperative Prods., Inc.*,
   479 F. Supp. 351 (N.D. Ga. 1979) ......................................................... 12, 13, 19

*MGM Studios, Inc. v. Grokster, Ltd.*,
   518 F. Supp. 2d 1197 (C.D. Cal. 2007) .......................................................... 20

*Monge v. Maya Magazines, Inc.*,
   688 F.3d 1164 (9th Cir. 2012) ........................................................................ 18

*New Line Cinema Corp. v. Bertelsmann Music Group, Inc.*,
   693 F. Supp. 1517 (S.D.N.Y. 1988) ............................................................... 13

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,
   16 F.3d 1032 (9th Cir. 1994) .......................................................................... 25

v

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ............................................................... 15

*Range Road Music, Inc. v. East Coast Foods, Inc.*,
   668 F.3d 1148 (9th Cir. 2012) ................................................................ 6

*Rogers v. Koons*,
   960 F.2d 301 (2d Cir. 1992) ................................................................. 17

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010) ................................................... 20, 21, 23

*Shaw v. Lindheim*,
   919 F.2d 1353 (9th Cir. 1990) ........................................................ 8, 9, 12

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
   562 F.2d 1157 (9th Cir. 1977) ........................................................ 8, 9, 13

*Sony Corp. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) .............................................................................. 19

*Stewart v. Abend*,
   495 U.S. 207 (1990) ........................................................ 15, 16, 18, 19

*Sweet People Apparel, Inc. v. Zipper Clothing*,
   2012 WL 1952842 (C.D. Cal. May 31, 2012) ............................... 21, 24

*Triad Sys. Corp. v. Southeast Express Co.*,
   64 F.3d 1330 (9th Cir. 1995) ................................................................. 24

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,
   715 F.2d 1327 (9th Cir. 1983) ................................................................. 5

*Twin Peaks Prods. v. Publications Int'l, Ltd.*,
   996 F.2d 1366 (2d Cir. 1993) ......................................................... 5, 19

*Ty, Inc. v. GMA Accessories, Inc.*,
   132 F.3d 1167 (7th Cir. 1997) ....................................................... 22, 23

*Universal City Studios, Inc. v. J.A.R. Sales, Inc.*,
   1982 U.S. Dist. LEXIS 16552 (C.D. Cal. Oct. 28, 1982) ................. 14

*Universal City Studios v. Film Ventures Int'l*,
   543 F. Supp. 1134 (C.D. Cal. 1982) .......................................... 10, 14

*Warner Bros. Entm't Inc. v. RDR Books*,
    575 F. Supp. 2d 513 (S.D.N.Y. 2008) ....................................................21, 24, 25

*Warner Bros. Entm't, Inc. v. WTV Systems, Inc.*,
    824 F. Supp. 2d 1003 (C.D. Cal. 2011)...........................................21, 22, 23, 25

*Winter v. Natural Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ......................................................................................... 5

## STATUTES

17 U.S.C. § 101.................................................................................................. 5

17 U.S.C. § 106............................................................................................. 1, 5

17 U.S.C. § 107.......................................................................................... 15, 16

## OTHER AUTHORITIES

1 NIMMER ON COPYRIGHT § 2.16 ....................................................................... 8

2 NIMMER ON COPYRIGHT § 8.09 ....................................................................... 5

Federal Rule of Civil Procedure 65(c)................................................................ 25

# I.    INTRODUCTION

This action arises out of Defendants' unauthorized production and distribution of an adult film titled *Fifty Shades of Grey: A XXX Adaptation* (the "XXX Adaptation"), which takes wholesale and without authorization the dialogue, characters, and storyline from E L James's bestselling novels *Fifty Shades of Grey*, *Fifty Shades Darker*, and *Fifty Shades Freed* (the "Fifty Shades Trilogy").[1]  Plaintiff Fifty Shades Limited ("FSL") holds copyrights in the massively popular Fifty Shades Trilogy, and in November 2012 plaintiff Universal City Studios LLC ("Universal") acquired the exclusive rights to produce and distribute motion pictures based on the Fifty Shades Trilogy.

As its title suggests, the XXX Adaptation blatantly infringes FSL's adaptation right – an exclusive right under the Copyright Act, 17 U.S.C. § 106(2). FSL licensed that right to Universal for purposes of film adaptations of the Fifty Shades Trilogy, after determining that Universal was the studio best equipped to ensure that the motion pictures faithfully and convincingly portray the books' passionate love story.  In turn, Universal paid valuable consideration for exclusive motion picture rights and has invested or will invest substantial resources in producing high-quality film adaptations that will satisfy fans of the novels while also presenting the trilogy's romantic story to a broader audience.

Plaintiffs ask this Court to enjoin the marketing, sale, and distribution of Defendants' infringing adaptation of the Fifty Shades Trilogy, a quickly and cheaply produced pornographic work that is likely to cause Plaintiffs irreparable harm by poisoning public perception of the Fifty Shades Trilogy and the forthcoming Universal films.[2]  Plaintiffs will succeed on the merits of their

---

[1] "Defendants" refers to Smash Pictures, Inc. ("Smash Pictures"), Luv Moves, Daniel Quinn, Stuart Wall, James Lane aka Jim Powers, and Right Ascension, Inc. dba Adult DVD Empire ("Right Ascension").

[2] Defendants are distributing the XXX Adaptation in DVD, video download, and streaming formats and are also selling the DVD as part of the "Fifty Shades of Pleasure: Play Kit & Movie," a package that includes various adult novelty items.

copyright infringement claim.[3]  Unlike a typical infringement case, Defendants here have provided abundant, direct evidence of their extensive copying from the Fifty Shades Trilogy.  Thumbing their noses at copyright law, Defendants have bragged publicly about how literally and extensively they have copied the Fifty Shades novels, touting their XXX Adaptation to the media as being "very true to the book."  Overwhelming evidence confirms these boasts and demonstrates that Defendants lifted the title, dialogue, characters, events, settings, story, and style from the Fifty Shades Trilogy, causing the XXX Adaptation to be substantially similar to the first two novels, *Fifty Shades of Grey* and *Fifty Shades Darker*, in its expressive elements.  As shown below, the balance of hardships also weighs decidedly in Plaintiffs' favor, and injunctive relief plainly would serve the public interest.  Accordingly, the Court should grant this motion.

## II.   FACTUAL BACKGROUND

**A.   The Fifty Shades Trilogy.**

*Fifty Shades of Grey* and its sequels *Fifty Shades Darker* and *Fifty Shades Freed* are phenomenally bestselling novels by E L James, a former TV executive, wife, and mother of two based in London.  The Fifty Shades Trilogy follows the romantic and erotic relationship between Anastasia Steele, a naïve college graduate, and Christian Grey, a wealthy but tormented entrepreneur.  In *Fifty Shades of Grey*, Anastasia first meets the handsome and intimidating business magnate when she interviews him for the college newspaper.  Drawn to one another, Anastasia and Christian embark on a passionately physical love affair.  The book – and the Trilogy as a whole – contains explicitly erotic scenes featuring

---

Defendants also are currently producing two additional infringing adaptations of the copyrighted novels *Fifty Shades Darker* and *Fifty Shades Freed*.  Defendants have agreed not to release a second adult film based on the Fifty Shades Trilogy before April 15, 2013.  *See* Dkt. No. 15.

[3] Although the basis for this motion is copyright infringement, Plaintiffs expect the evidence obtained through discovery will also establish Defendants' liability for trademark infringement, unfair competition, dilution, and violations of California law based on their marketing and sale of the XXX Adaptation.

elements of bondage/discipline, dominance/submission, and sadism/masochism. *See* Declaration of Erika Mitchell ("Mitchell Decl."), Ex. 1.

*Fifty Shades Darker* and *Fifty Shades Freed* further chronicle Anastasia and Christian's growth and struggles as a couple. Daunted by Christian's singular tastes and dark secrets, Anastasia breaks off their relationship, but she cannot resist rekindling the sensual affair when Christian proposes a new arrangement. Over time, Anastasia learns more about her lover's harrowing past and his introduction to dominant/submissive relationships, while Christian wrestles with his inner demons. Confronting these challenges, as well as the anger and envy of Christian's former partners, the two finally marry. Just when it seems Anastasia and Christian have overcome all obstacles to their happiness, the drama escalates when the lives of members of their families are threatened, building to the trilogy's dramatic conclusion. *See* Mitchell Decl., Exs. 2 & 3.

In May 2011, *Fifty Shades of Grey* was released as an e-book and print-on-demand paperback by an independent online publisher in Australia. Mitchell Decl. ¶ 2. Less than two years later, more than 35 million copies have been sold in the United States and 68 million worldwide. *Id.* ¶ 4. The entire Fifty Shades Trilogy has spent more than 41 weeks on the *New York Times* bestseller lists as of January 22, 2013, and its popularity shows little signs of waning. *Id.* These record-setting sales figures tell only part of the story. The Fifty Shades Trilogy's provocative exploration of female sexuality has "electrified women across the country," "permeated every conceivable crack of human existence," and has "ignite[d] a cultural fervor." *Id.* ¶ 5. Ms. James' impact on the publishing industry has been so significant that she was named Publishing Person of the Year for 2012 by *Publishers Weekly*, in addition to the numerous awards bestowed on the books themselves. *Id.* ¶ 6.

**B.     Universal's Exclusive Motion Picture Rights.**

America's oldest motion picture studio, Universal has a long and successful

history of adapting literary works to the motion picture screen.  *See* Declaration of David K. Brooks ("Brooks Decl.") ¶ 2.  Universal completed its acquisition of exclusive film rights to the Fifty Shades Trilogy in November 2012.  *Id.* ¶ 6.  Focus Features – Universal's critically-acclaimed specialized film division, known for Academy-Award-winning adaptations including *Brokeback Mountain* and *The Pianist* – will develop the motion pictures based on the Fifty Shades Trilogy (the "Fifty Shades Films").  The release dates for the Fifty Shades Films are yet to be determined, though marketing efforts already are underway.  *Id.* ¶ 7.

**C.    Defendants' Infringing Adaptation.**

In September 2012, Defendants released *Fifty Shades of Grey: A XXX Adaptation*[4] as a DVD available for sale throughout the United States and overseas. The DVD's back cover succinctly spells out Defendants' infringing purpose: "Based upon the best selling series of books that has swept the world and coined the new term 'mommy porn,' FIFTY SHADES OF GREY, A XXX ADAPTATION puts the kinky fantasies that you only imagined into vivid color." *See* Kohn Decl. ¶ 2, Exs. 6 & 7.  Defendants have freely admitted to the media that they sought to replicate the Fifty Shades Trilogy as accurately as possible, describing the XXX Adaptation as "very true to the book," with a script written "to be as close to the series as [the director] can get."[5]  *Id.* ¶ 10, Ex. 16.

## III.    ARGUMENT

Plaintiffs may obtain a preliminary injunction by showing that they are "likely to succeed on the merits, that [they are] likely to suffer irreparable harm in

---

[4] The words "A XXX Adaptation" appear in a much smaller font size than the rest of the title.  *See* Declaration of Lisa Kohn ("Kohn Decl.") ¶ 2, Exs. 6 & 7.

[5] Notwithstanding the extensive copying found in the XXX Adaptation, Defendants' motion picture presents a crass pornographic version of the Fifty Shades Trilogy, a fact highlighted by the DVD menu option of "WALL TO WALL SEX" playback, eliminating all dialogue and story.  *See* Kohn Decl. ¶ 5, Ex. 10. Additionally, in comparison to the millions of dollars and months of development that Plaintiffs will invest in the forthcoming Fifty Shades Films, the XXX Adaptation was shot in two days on a porn-company budget, and is of vastly inferior quality as a result.  *See id.* ¶ 5, Ex. 11; *see also* Ex. 6.

the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, *Inc.* 555 U.S. 7, 20 (2008).  Alternatively, an injunction should issue if Plaintiffs show "serious questions going to the merits" and a "balance of hardships that tips sharply towards the plaintiff[s]," so long as they also show "that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

**A.     Plaintiffs Will Prevail On Their Copyright Infringement Claim.**

To establish copyright infringement, a plaintiff must show (1) ownership of a valid copyright and (2) violation by the defendant of "at least one exclusive right granted to copyright holders" under 17 U.S.C. § 106.  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).  One of the exclusive Section 106 rights reserved to the copyright holder is the right to make and authorize others to make derivative works, otherwise known as the adaptation right.  *See* 17 U.S.C. § 106(2); *Twin Peaks Prods. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1373 (2d Cir. 1993).  *See generally* 2 NIMMER ON COPYRIGHT § 8.09 ("the right to make derivative works, *i.e.*, the adaptation right").

Section 101 of the Copyright Act defines a derivative work as "a work based upon one or more preexisting works, such as a … *motion picture version* … or any other form in which a work may be recast, transformed, or adapted."  17 U.S.C. § 101 (emphasis added).  The Supreme Court established more than a century ago that a motion picture version of a book infringes the author's copyright.  *See Kalem Co. v. Harper Bros.*, 222 U.S. 55, 62-63 (1911) (affirming injunction prohibiting defendant from distributing the silent film *Ben Hur*, which was based on the Lew Wallace novel *Ben Hur*).  It is now hornbook law that "[a]n unauthorized dramatization of a novel clearly constitutes an infringement of the adaptation right."  2 NIMMER ON COPYRIGHT § 8.09; *accord Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1329 (9th Cir. 1983) (where defendant's work

"is adapted for use in a medium different than that of plaintiff's, the test for infringement remains the same").

With respect to the first element (ownership), FSL owns valid copyrights in the Fifty Shades Trilogy, *see* Mitchell Decl. ¶ 3, Ex. 4 (registrations), and Universal is the owner of exclusive rights to produce and distribute motion pictures based on the Fifty Shades Trilogy, *see* Brooks Decl. ¶ 6, Ex. 5.

With respect to the second element (unlawful copying), in copyright infringement actions "[t]here seldom is any direct evidence of copying." *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 206 (9th Cir. 1988). But where proof of actual copying of protected elements of a plaintiff's work *is* demonstrated, "that is the end of the case." *M. Kramer Mfg. Co., Inc. v. Andrews*, 783 F.2d 421, 445 (4th Cir. 1986); *see also Range Road Music, Inc. v. East Coast Foods, Inc.*, 668 F.3d 1148, 1154 (9th Cir. 2012) (a showing of substantial similarity is "irrelevant" where a plaintiff produces evidence of direct copying of expressive elements); *Broderbund Software, Inc. v. Unison World, Inc.*, 648 F. Supp. 1127, 1135 (N.D. Cal. 1986) (copying proven by direct evidence). Copying also may be established "by circumstantial evidence of (1) the defendant's access to the copyrighted work prior to defendant's creation of its work, and (2) the substantial similarity of both the general ideas and expression between the copyrighted work and defendant's work." *Data East*, 862 F.2d at 206.

Here, there is both direct and circumstantial evidence of unlawful copying. *First*, Defendants *admit* the XXX Adaptation is a derivative work that copies the expressive elements of the Fifty Shades Trilogy. *Second*, a side-by-side comparison of the parties' works confirms that they are substantially similar.

### 1.   Defendants Admit They Copied The Fifty Shades Trilogy.

Defendants cannot seriously dispute that they had access to E L James's novels, given their use of the title *Fifty Shades of Grey: A XXX Adaptation* and the numerous statements they made to promote their infringing work. *See*, *e.g.*, Kohn

1  Decl., Ex. 7 (DVD cover); Ex. 16 (*L.A. Weekly* article ); Ex. 18 (Smash Pictures

2  press release); Ex. 25 (photograph of actress who plays Anastasia Steele, the main

3  character, holding the three books of the Fifty Shades Trilogy) [shown below].

4      Unlike most copyright infringement cases,

5  Defendants here have admitted, enthusiastically,

6  that they copied the underlying works by creating

7  an adult film adaptation of the Fifty Shades

8  Trilogy.  Indeed, touting their extensive and

9  literal copying has been the centerpiece of

10  Defendants' marketing strategy.  Defendants

11  titled their film an "Adaptation" and proclaimed

12  on the back cover that it is "[b]ased upon the best

13  selling series of books that has swept the world …."



Exhibit 25

14  *See* Kohn Decl. Exs. 6 &7.  They stressed to the

15  media that they replicated the Fifty Shades Trilogy as accurately as possible.

16  Defendant Stuart Wall, Vice President of Smash Pictures, proclaimed in an

17  interview with the *L.A. Weekly* newspaper that "we're choosing to go with a XXX

18  adaption which will stay very true to the book and its S&M-themed romance."  *Id.*,

19  Ex. 16.  He elaborated that "the entire cast is reading the books as we speak, and

20  director Jim Powers is writing the script to be *as close to the series as he can get*."

21  *Id.* (emphasis added); *see also id.*, Exs. 15, 17-30.  Mr. Powers told XBIZ, a news

22  organization that covers the adult entertainment industry, "I stayed faithful to the

23  core material."  *Id.*, Ex. 19.  He further recounted:

24
25      I was handed Book Two and told to read it and make that one.  . . .
      Not knowing how much was in Book One, I said we might as well do
26      all three books at once so we would have a story.  Obviously, we bit
      off a lot.  To be able to pull it off in a porn budget/timeframe, I took
27      the main elements of the first book … and utilized the most interesting
      character from the second: his insane ex-sub.  Also the masquerade
28      ball is from the second one, as well as the dance auction.

*Id.*  These statements establish that Defendants copied the expressive elements of the Fifty Shades Trilogy in creating the XXX Adaptation.  Where, as here, proof of actual copying of protected elements of a plaintiff's work is demonstrated, "that is the end of the case."  *M. Kramer*, 783 F.2d at 445.

**2.      The XXX Adaptation Is Substantially Similar To *Fifty Shades Of Grey* And *Fifty Shades Darker*.**

The Ninth Circuit employs an extrinsic/intrinsic analysis to determine substantial similarity.  *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977).  The "extrinsic test" is an "objective comparison of specific expressive elements."  *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002).  In the context of works of fiction, the extrinsic test "focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" of the two works.  *Id.* (citation omitted).  The title of a work is also a factor in applying the extrinsic test.  *See Shaw v. Lindheim*, 919 F.2d 1353, 1362 (9th Cir. 1990).  The "intrinsic test" is a subjective comparison that focuses on "'whether the ordinary, reasonable audience' would find the works substantially similar in the 'total concept and feel of the works.'"  *Cavalier*, 297 F.3d at 822 (citation omitted).

**a.      Application of the Extrinsic Test.**

**Title**:  The title of Defendants' film, *Fifty Shades of Grey: A XXX Adaptation*, strongly suggests that it is substantially similar to *Fifty Shades of Grey* and is in fact an adaptation of the book.  *See Shaw*, 919 F.2d at 1362 (copying of a title is a "'factor in establishing whether the substance of plaintiff's work (not the title) has been copied'") (quoting 1 NIMMER ON COPYRIGHT § 2.16).

**Characters**:  The XXX Adaptation appropriates all of the main characters of the Fifty Shades Trilogy in name, description, and characterization.  In both works, Anastasia Steele is a young, naïve woman who becomes romantically and erotically embroiled with Christian Grey, a wealthy entrepreneur.  Anastasia is an

English literature major, works at a hardware store, is a virgin at the outset of the story, lives with a roommate named Kate Kavanagh, frequently bites her lip, is alternately timid and playful with Christian, is uncomfortable accepting his expensive gifts, and refers to a part of herself as her "Inner Goddess." *Compare* Ex. 1 *with* Ex. 6. Christian is a highly successful businessman who employs over 40,000 people, describes himself as an adherent of the principles of Andrew Carnegie, is a self-professed "dominant" who seeks out control-based sexual relationships with women, does not like to be touched, insists that Anastasia eat properly and take care of herself, and has not been able to sleep in the same bed with a woman until Anastasia. *Compare* Ex. 1 *with* Ex. 6.

The XXX Adaptation also portrays Kate Kavanagh, Anastasia's more sexually experienced roommate; Elena Lincoln (referred to in both works by the nickname "Mrs. Robinson"), an older woman who introduced Christian to BDSM relationships when he was a teenager; and Leila Williams, a former partner of Christian's who becomes jealous of Anastasia and threatens her with a gun. *Compare* Exs. 1 & 2 *with* Ex. 6. These characters are not merely similar; they are identical in every detail, from their names to their mannerisms. Courts have found substantial similarity where the commonalities were far less striking than here. *See*, *e.g.*, *Shaw*, 919 F.2d at 1358 (finding substantial similarity where "many of defendants' characters share similar traits with plaintiffs' characters"); *Krofft*, 562 F.2d at 1167 (finding characters substantially similar where both works featured "mayors who have disproportionately large round heads dominated by long wide mouths," as well as "crazy scientists and a multi-armed evil creature").[6]

---

[6] *See also Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co.*, 900 F. Supp. 1287, 1298 (C.D. Cal. 1995) (finding substantial similarity where "the characters of Bond and the Honda man are very similar in the way they look and act – both heroes are young, tuxedo-clad, British-looking men with beautiful women in tow and grotesque villains close at hand; moreover, both men exude uncanny calm under pressure, exhibit a dry sense of humor and wit, and are attracted to, and are attractive to, their female companions"); *Universal City Studios v. Film Ventures Int'l*, 543 F. Supp. 1134, 1137 (C.D. Cal. 1982) ("all the major characters in *Great White* have substantially similar counterparts in *Jaws*").

**Plot and Sequence of Events**: Both the Fifty Shades Trilogy and the XXX Adaptation recount the progression of Anastasia Steele's relationship with the wealthy but sexually damaged Christian Grey. The synopsis of the XXX Adaptation on the Defendants' own DVD packaging aptly describes the plot of both the Fifty Shades Trilogy and the XXX Adaptation (except for the names of the adult film actors):

> When an inexperienced college student, Anastasia Steele, meets an extremely wealthy and handsome young business tycoon, Christian Grey, a whirlwind romance encompassing the kinkiest of pleasures soon ensues. Christian, (Ryan Driller) takes the inexperienced virgin Anastasia, (Allie Haze) into a world of BDSM role-playing. Anastasia is completely swept up and scared as she has never experienced anything like this. She spent her last four years reading English literature while living vicariously through her outgoing roommate Kate (Alexis Ford). What made her charming prince like this? Was it the training in masochism he received at the hands of an older woman Mrs. Robinson (Julia Ann)? How many shades of the object of her love must she push through to find true love?

Kohn Decl., Exs. 6 & 7. As shown by Exhibit 8, virtually all of the events in the XXX Adaptation are copied directly from *Fifty Shades of Grey* and *Fifty Shades Darker*, and occur in substantially the same sequence. *See Universal v. Film Ventures Int'l*, 543 F. Supp. at 1137 (finding substantial similarity of the "basic story points" of plaintiffs' film *Jaws* and defendants' film *Great White*).

As in *Fifty Shades of Grey*, the XXX Adaptation begins with Anastasia interviewing Christian for the college newspaper. *Compare* Ex. 1 at 7-15 *with* Ex. 6 at 1:23-6:04.[7] After the interview, he sends her a box of rare books, including a card with a quotation from *Tess of the d'Urbervilles*. *Compare* Ex. 1 at 54-56 *with* Ex. 6 at 9:23-10:05. While intoxicated at a bar, Anastasia calls Christian and confronts him about this gift. *Compare* Ex. 1 at 57-58 *with* Ex. 6 at 10:06-10:42. Christian takes an inebriated Anastasia home and puts her to bed. He later explains

---

[7] The time codes cited for the XXX Adaptation reflect the onscreen timer that is displayed by a computer on playback.

that he used cell phone tracking technology to locate her and chides her for drinking on an empty stomach.  *Compare* Ex. 1 at 66-68 *with* Ex. 6 at 10:43-11:44.

Christian shows Anastasia his "playroom," stocked with whips, chains, and other items Christian uses in his dominant/submissive sexual activities.  *Compare* Ex. 1 at 98-101 *with* Ex. 6 at 12:33-14:37.  He presents her with a non-disclosure agreement and a contract that would govern their dominant/submissive relationship, which includes regulations of dress, exercise, and personal grooming.  *Compare* Ex. 1 at 95-96, 102-08 *with* Ex. 6 at 14:38-17:22.  Anastasia confesses she is a virgin, and Christian takes Anastasia's virginity as described in *Fifty Shades of Grey*.  *Compare* Ex. 1 at 108-18 *with* Ex. 6 at 17:28-27:43.  Anastasia later emails Christian, telling him she is not willing to accept his rules and be his submissive.  He immediately goes to her apartment and tries to change her mind.  They then have sex in the manner described in *Fifty Shades of Grey*.  *Compare* Ex. 1 at 188-98 *with* Ex. 6 at 1:24:29-1:36:08.  They later have sex while Anastasia is blindfolded and forced to listen to music through headphones.  *Compare* Ex. 1 at 484-93 *with* Ex. 6 at 2:05:09-2:12:14.  Christian and Anastasia attend a masquerade ball, where "Mrs. Robinson" threatens Anastasia and Anastasia's "first dance" is auctioned for $100,000.  *Compare* Ex. 2 at 145-49, 158-60 *with* Ex. 6 at 1:37:21-1:42:05.  Leila Williams, an ex-lover of Christian's, confronts Anastasia with a gun; the scene ends without violence, and Leila is hospitalized.  *Compare* Ex. 2 at 309-14, 320 *with* Ex. 6 at 2:12:15-2:14:31.  Christian later declares his love and proposes marriage.  *Compare* Ex. 2 at 530 *with* Ex. 6 at 2:15:01-2:15:45.

**Dialogue**:  As shown in Exhibit 9 – a 39-page chart comparing dialogue between the XXX Adaptation on the one hand and *Fifty Shades of Grey* and *Fifty Shades Darker* on the other – in scene after scene the dialogue in the XXX Adaption is taken directly, and frequently in verbatim form, from the Fifty Shades Trilogy.  *See* Kohn Decl., Ex. 9.  Even the lengthy written contract that Christian presents to Anastasia to govern their relationship – a highly distinctive plot point in

both works – is copied in verbatim form.  *Compare* Ex. 1 at 105-08 *with* Ex. 6 at 16:40-16:45 & Ex. 13 (screenshots from XXX Adaptation).

Defendants' copious use of dialogue from the Fifty Shades Trilogy compels a finding of substantial similarity.  *See Benny v. Loew's, Inc.*, 239 F.2d 532, 536 (9th Cir. 1956) (substantial similarity shown where plaintiff established "a detailed borrowing of much of the dialogue with some variation in wording"); *Shaw*, 919 F.2d at 1358 (finding that plaintiff made a sufficient showing of substantial similarity to defeat summary judgment partly because the "dialogue in the respective works do share some striking similarities"); *Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Cooperative Prods., Inc.*, 479 F. Supp. 351, 356 (N.D. Ga. 1979) (finding "clear" substantial similarity where dialogue in the musical *Scarlett Fever* was "often near-verbatim of the dialogue in the film 'Gone With The Wind,' though … in a condensed manner").

**Setting**:  The scenes depicted in the XXX Adaptation are set in the same locations as in the Fifty Shades Trilogy, from Christian's opulent home to the modest apartment Anastasia shares with her roommate to the masquerade ball they attend.  As in *Fifty Shades of Grey*, the XXX Adaptation depicts Anastasia and Christian discussing the dominant/submissive contract he proposes in the kitchen of his home and depicts the couple having sex in his bedroom, his bathroom, and his "playroom."  The playroom is a key location in both works.  Stuart Wall, Vice President of Smash Pictures announced on Twitter:  "Love the dungeon we found for '50 Shades of Grey-XXX Adapt[at]ion' fans of the books are going to love this!"  Kohn Decl., Ex. 30.  The playroom in Defendant's film is a low-budget version of the "womb-like" room described in the novels, with a four-poster bed, an ox-blood couch, and various BDSM sex toys.  *Compare* Ex. 1 at 98-99 *with* Ex. 12 (screenshots from XXX Adaptation).  The XXX Adaptation also borrows the masquerade ball setting from *Fifty Shades Darker*, as the director acknowledged in

1  an interview: "the masquerade ball is from the second [book], as well as the dance

2  auction."  Ex. 19; *compare* Ex. 2 at 129-64 *with* Ex. 6 at 1:37:21-1:42:48.

3      Thus, the settings in the XXX Adaptation are substantially similar to those in

4  the Fifty Shades Trilogy.  *See Metcalf v. Bochco*, 294 F.3d 1069, 1073 (9th Cir.

5  2002) (finding "similarities between the relevant works are striking" where both

6  works were "set in overburdened county hospitals in inner-city Los Angeles with

7  mostly black staffs"); *Krofft*, 562 F.2d at 1167 n.9 (sufficient similarity where both

8  works were set in imaginary worlds with trees, caves, a pond, a road, and a castle).[8]

9      **Themes**:  The Fifty Shades Trilogy and the XXX Adaptation combine the

10  themes of romance and love with bondage/discipline, dominance/submission, and

11  sadism/masochism.  As noted above, Smash Pictures has admitted in the press that

12  the XXX Adaptation "stay[s] very true to the book and its S&M-themed romance."

13  Smash Pictures' vice president also admitted on the "Adult DVD Talk Forum" that

14  "The BDSM theme is all taken from the book to relay our adaptation of the story."

15  Kohn Decl., Exs. 16, 22.  The XXX Adaptation expresses the themes "taken from

16  the book" in the same manner as the books – by portraying how the emotionally

17  damaged Christian turns to sexual relationships in which he controls women and

18  cannot be touched, how Anastasia is both drawn to and frightened by Christian's

19  dark desires, and how the couple explore their emotional and physical boundaries

20  as they develop trust and love for each other.  *Compare* Exs. 1 & 2 *with* Ex. 6.

21      **Mood and Pace**:  The mood of both the Fifty Shades Trilogy and the XXX

22  Adaptation is both erotic and romantic.  *Compare* Exs. 1 & 2 *with* Ex. 6.

23  Significantly, Defendants' film appropriates not only the sexual content of the

24  Fifty Shades Trilogy, but its romantic components as well – albeit in a clumsy and

25

26  [8] *See also Showcase Atlanta*, 479 F. Supp. at 354 (use of the Tara plantation house
    and the Atlanta train depot as background for scenes in *Scarlett Fever* supported
27  finding of substantial similarity to *Gone with the Wind*); *New Line Cinema Corp. v.
    Bertelsmann Music Group, Inc.*, 693 F. Supp. 1517, 1522 (S.D.N.Y. 1988) (finding
28  substantial similarity where both works were "set in an abandoned, poorly lit, and
    highly threatening old house").

unconvincing manner.  Smash Pictures' press release for the XXX Adaptation
confirmed Defendants' intention to depict the romantic aspects of the characters'
relationship: "this film captures the book's flavor of an emotional relationship
that's not as much about sex as it is about trust and commitment."  Ex. 18.  Indeed,
the first 18 minutes of Defendants' film does not depict any sex between Christian
and Anastasia; instead, it shows the development of their feelings toward each
other using scenes and dialogue taken from *Fifty Shades of Grey*.[9]

### b. Application of the Intrinsic Test.

Given the totality of the similarities detailed above, an ordinary observer
readily would find that Defendants' film is exactly what Defendants have
presented it to be – a pornographic film adaptation of the Fifty Shades Trilogy.
*See Bradbury v. Columbia Broadcasting System, Inc.*, 287 F.2d 478, 484 (9th Cir.
1961) (ordinary observer test satisfied where "[t]he incidents and their sequence …
are too similar to be coincidental" and that the differences between the works "are
no more than [the defendant] believed necessary in order to adapt plaintiff's story
to the limitations of the television screen"); *Film Ventures*, 543 F. Supp. at 1141
(C.D. Cal. 1982*)* (finding that due to "[t]he similarity in the basic story lines, the
major characters, the sequence of events, and the interplay and development of the
characters and the plot," defendant's film *Great White*, "captured the 'total concept
and feel'" of *Jaws*).[10]  The similarities here are far more numerous and pronounced

---

[9] The pace of the works is also parallel.  Anastasia and Christian's relationship
develops slowly at first, as Anastasia is both drawn to Christian and frightened by
his sexual tastes, and the demons of Christian's past are gradually revealed.  As the
story progresses, however, the pace of the story quickens when Christian's former
partner confronts Anastasia with a gun.  *Compare* Exs. 1 & 2 *with* Ex. 6.

[10] *See also Columbia Pictures Indus. v. Miramax Films Corp.*, 11 F. Supp. 2d
1179, 1186 (C.D. Cal. 1998) (granting preliminary injunction where an ordinary
viewer would consider the parties' movie posters and trailers to be substantially
similar based on various similarities of expression); *Universal City Studios, Inc. v.
J.A.R. Sales, Inc.*, 1982 U.S. Dist. LEXIS 16552, at *9 (C.D. Cal. Oct. 20, 1982)
(granting preliminary injunction where "the total concept and feel of defendants'
dolls is the same as the character 'E.T.' in the copyrighted motion picture").

than in the *Bradbury* and *Jaws* cases, since the Defendants copied not only the incidents and their sequence, but also the title, the dialogue, and every aspect of the main characters, including their names.  Accordingly, the ordinary reasonable observer would immediately recognize the similarity of expression between the XXX Adaptation and the Fifty Shades Trilogy.

### 3. The XXX Adaptation Is Not A Fair Use.

After receiving a cease and desist letter from Plaintiffs, Defendants changed the DVD cover of the XXX Adaptation to include the words "A Parody" in small type.  Kohn Decl., Exs. 6 & 7.  Plaintiffs thus expect Defendants will argue that the XXX Adaptation is protected by copyright law's fair use defense.  That defense, however, has no application here, as merely calling a film a parody does not make it one.  To the contrary, "[t]his case presents *a classic example of an unfair use*: a commercial use of a fictional story that adversely affects the story owner's adaptation rights."  *Stewart v. Abend*, 495 U.S. 207, 238 (1990) (emphasis added).

Any fair use defense raised by Defendants must be analyzed under the Copyright Act's four non-exclusive factors: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  *See* 17 U.S.C. § 107.  Because fair use is an affirmative defense to a claim of infringement, Defendants bear the burden of proof on the issue.  *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007).  They cannot meet that burden here, as all four fair use factors clearly favor Plaintiffs.

---

The Ninth Circuit's decision in *Bradbury* is instructive in applying the "ordinary observer" or intrinsic test here.  In that case, author Ray Bradbury alleged that a television production entitled *A Sound of Different Drummers* was an infringing adaptation of his short story "The Fireman" and his novel *Fahrenheit 451*.  *See* 287 F.2d at 479.  The Court found it "apparent that an ordinary person or observer, after reading The Fireman, Fahrenheit 451, and seeing the picture A Sound of Different Drummers, would note similarities as we did which would bring about a belief that A Sound Of Different Drummers is a dramatization or adaptation of Fahrenheit 451."  *Id.* at 484.

### a.   The Purpose and Character of the Use.

The first fair use factor focuses on the purpose and character of the use, "including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).  The XXX Adaptation plainly was produced for commercial gain, which weighs against fair use.  *See Abend*, 495 U.S. at 237 (motion picture adaptation of story was released for commercial gain); *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1401 (9th Cir. 1997) (defendants' commercial use, a book about the O.J. Simpson trial, cut against fair use).  Defendants cynically have sought to capitalize on the worldwide success of the Fifty Shades Trilogy by hastily producing a porn movie version. Indeed, they have boasted on Twitter that the XXX Adaptation is their "biggest film of the year" and has been the number-one bestseller on defendant Right Ascension's Adult DVD Empire website and the Adult Video News list of bestselling adult films.  *See* Kohn Decl., Exs. 24, 31.

Under the first factor, courts also consider whether the new work is "transformative" of the original, asking whether it "adds something new, with a further purpose or different character," altering the first "with new expression, meaning, or message," rather than merely superseding the object of the original. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994); *Dr. Seuss*, 109 F.3d at 1400.  Adapting a copyrighted work into a new medium of expression – turning a short story into a play, or a novel into a motion picture – is not "transformative" for purposes of the fair use analysis.  *See Napster*, 239 F.3d at 1015; *Castle Rock Entm't v. Carol Publ'g Group*, 150 F.3d 132, 143 (2d Cir. 1998).

Although parody may qualify as a fair use, "[t]he threshold question when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived."  *Campbell*, 510 U.S. at 582.  Where a defendant does not copy from the original work in order to critique or comment on the original, the use is not parodic or transformative.  As the Supreme Court explained: "For the

purposes of copyright law, … the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, *comments on that author's works*." *Id.* at 580 (citations omitted; emphasis added). "It is this *joinder of reference and ridicule* that marks off the author's choice of parody." *Id.* at 583 (emphasis added). If, on the contrary, the defendant copies from the prior work "merely … to get attention or to avoid the drudgery in working up something fresh, the claim to fairness … diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger ...." *Id.* at 580.

Applying these principles, the Ninth Circuit rejected a fair use defense in *Dr. Seuss*, which concerned a purported parody of *The Cat in the Hat* involving the O.J. Simpson criminal trial. The Court held the defendant's work was not a parody because it did not comment on, criticize, or make fun of the copyrighted work: "Although *The Cat NOT in the Hat!* does broadly mimic Dr. Seuss' characteristic style, it does not hold his style up to ridicule. The stanzas have 'no critical bearing on the substance or style of' *The Cat in the Hat*." 109 F.3d at 1401 (citing *Campbell*, 510 U.S. at 580). Similarly, in *Columbia Pictures v. Miramax Films*, *supra*, the court rejected a parody defense because the defendants' advertisement did not comment on or criticize the plaintiffs' advertisement and thus did not constitute a "transformative work which alters the original with new expression, meaning, or message." *See* 11 F. Supp. 2d at 1188.[11]

Here, the XXX Adaptation has no discernible parodic character. It does not poke fun at, ridicule, or comment on the Fifty Shades Trilogy. Rather, it faithfully

---

[11] *See also Castle Rock*, 150 F.3d at 142-43 (finding trivia book drawn entirely from the TV series *Seinfeld* was not transformative, due to a lack of alteration of the original, lack of commentary or analysis in the book, and statements on the book cover and by the author that the book was intended to "satisfy between-episode cravings" and to "capture *Seinfeld*'s flavor in quiz book fashion"); *Rogers v. Koons*, 960 F.2d 301, 310-11 (2d Cir. 1992) (finding it "difficult to discern any parody" in a near-exact sculptural reproduction of a photograph; "it is not really the parody flag that appellants are sailing under, but rather the flag of piracy").

includes every material element of the first novel in the pornographic film. That is not parody under any definition and certainly not under the Supreme Court's definition in *Campbell*. Given the obvious commercial motive and wholesale lack of transformative purpose, the first factor weighs heavily in favor of Plaintiffs.

### b.    The Nature of the Copyrighted Work.

Because *Fifty Shades of Grey* and *Fifty Shades Darker* are creative works of fiction, they are "closer to the core of intended copyright protection than [other works], with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586; *see also Abend*, 495 U.S. at 237-38; *Dr. Seuss*, 109 F.3d at 1402. Accordingly, this factor favors Plaintiffs.

### c.    The Amount and Substantiality of the Portion Used.

The amount of the taking here, as detailed above and in Exhibits 8 and 9 to the Kohn Declaration, is substantial in both quality and quantity. In *Abend*, the Supreme Court affirmed the Ninth Circuit's determination that plaintiff's story was a substantial portion of defendants' motion picture, because the latter "expressly use[d] the story's unique setting, characters, plot, and sequence of events." 495 U.S. at 238. Here, Defendants' XXX Adaptation uses the plot, events, characters, dialogue, themes, settings, mood, pace, and even the title *Fifty Shades of Grey*. This factor also clearly weighs against fair use.

### d.    The Impact on the Actual or Potential Market.

Actual or potential market harm – which the Ninth Circuit and Supreme Court have recognized as a critical and often determinative factor – compels the conclusion that Defendants' use of the Fifty Shades Trilogy in producing the XXX Adaptation is not a fair use. *See Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1182 (9th Cir. 2012) ("to negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work") (quoting *Harper & Row*, *Publrs. v. Nation Enters.* 471 U.S. 539, 568 (1985)). The Court must consider the harm to the Fifty Shades

Trilogy, the Fifty Shades Films that Universal and Focus Features are currently producing, and other authorized derivative works.  *See Harper & Row*, 471 U.S. at 568 (courts "must take account not only of harm to the original but also of harm to the market for derivative works").  Where the defendant's use is non-transformative and commercial, the "likelihood [of market harm] may be presumed."  *Napster*, 239 F.3d at 1016 (quoting *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984)).

The non-transformative adaptation of one work into another medium plainly may harm the market for the originals, as well as the market for authorized derivative works.  *See*, *e.g.*, *Abend*, 495 U.S. at 238 (re-release of a film based on plaintiff's story "impinged on the ability to market new versions of the story," noting that "[c]ommon sense would yield the same conclusion"); *Twin Peaks*, 996 F.2d at 1377 (fourth factor favored plaintiff where book about TV series "may interfere with the primary market for the copyrighted works and almost certainly interferes with legitimate markets for derivative works"); *Showcase Atlanta*, 479 F. Supp. at 361 (unauthorized theatrical adaptation would harm the market for authorized derivative works).  Unauthorized use of the original in connection with a low-budget work may further harm its licensing value.  *See American Honda*, 900 F. Supp. at 1300 ("it is likely that James Bond's association with a low-end Honda model will threaten its value in the eyes of future upscale licensees").

Here, because the XXX Adaptation is not transformative in any way, it is likely to serve as a substitute for both the Fifty Shades Trilogy and the authorized film versions that Universal and Focus Features are producing.  The XXX Adaptation, which was produced on a "porn budget/timeframe" (Kohn Decl., Ex. 19) – that is, cheaply and quickly – will harm the market for the original novels and the authorized Universal films by leading consumers to believe that those works might be similar in quality.  The XXX Adaptation also interferes with Universal's ability to market its authorized films, since it will be more difficult to

build public anticipation for a film yet to be released when another motion picture version is already available.  *See* Brooks Decl. ¶¶ 11, 17-19, 21.[12]

Moreover, the "unrestricted and widespread conduct of the sort engaged in by the defendant," *i.e.*, the production and sale of low-budget adult film adaptations of the Fifty Shades Trilogy, "would result in a substantially adverse impact on the potential market" for the Fifty Shades Trilogy, the Fifty Shades Films, and other authorized derivative works.  *Campbell*, 510 U.S. at 590 (citation omitted).  If Plaintiffs do not succeed in enjoining this unauthorized adaptation, then it will be impossible to stop others from following suit, rendering meaningless Plaintiffs' *exclusive* right to prepare derivative works under 17 U.S.C § 106(2).

**B.    Plaintiffs Will Suffer Irreparable Harm Absent An Injunction.**

"In the context of copyright infringement cases, the harm to the plaintiff's property interest has often been characterized as irreparable," as monetary remedies are either insufficient or incalculable where the harm is to goodwill in the copyrighted work, control over the copyrighted work, or even to future sales.  *See Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010); *accord MGM Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1214-19 (C.D. Cal. 2007).  Consequently, "[i]n run-of-the-mill copyright litigation … proof of [irreparable] harm stemming from infringement – such as harm to business reputation and market share  – should not be difficult to establish."  *Apple Inc. v. Psystar Corp*, 673 F. Supp. 2d

---

[12] While the Fifty Shades Trilogy has been wildly popular among women (*see* Mitchell Decl. ¶ 5), Plaintiffs anticipate that the authorized film will draw a greater audience of men.  Many of the women who loved the books will see the movie with their husbands, boyfriends, or partners, who are more likely to watch a movie as a couple than read a trilogy of romance novels.  *See* Mitchell Decl. at ¶ 7; Brooks Decl. ¶ 10.  By their own admission, Defendants are capitalizing on this market.  As Stuart Wall stated in Smash Pictures' press release for the XXX Adaptation, Defendants' infringing film targets the same audience as the Fifty Shades Trilogy and Universal's authorized motion picture adaptations: "Since this was a romance novel, those interested in the book aren't the typical guys who watch pornography and go into adult shops, it's women that find this subject matter interesting.  The book is still the number one title on the charts for romance novels, and *our market is couples* and romance films."  Kohn Decl., Ex. 18 (emphasis added).  This overlap necessarily interferes with and harms the market for Universal's authorized adaptations.

943, 948 (N.D. Cal. 2009).  This includes infringement of the copyright holder's

exclusive right to prepare and license derivative works.  *See id.* at 948-49; *Warner*

*Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 552-53 (S.D.N.Y. 2008).

### 1.      The XXX Adaptation Will Damage Goodwill In The Trilogy.

Courts routinely find irreparable harm where the continued distribution and

sale of infringing works threatens damage to the goodwill in the copyrighted work.

*See*, *e.g.*, *Warner Bros. Entm't, Inc. v. WTV Systems, Inc.*, 824 F. Supp. 2d 1003,

1012-14 (C.D. Cal. 2011) (irreparable harm shown where defendant's

unauthorized distribution of plaintiff's movies over the Internet threatened the

goodwill of consumers and authorized licensees).[13]  Loss of goodwill and

reputation among consumers and licensing partners is "the type of irreparable

injury that Plaintiffs 'should not be expected to suffer.'"  *Id.* at 1014 (quoting

*Salinger*, 607 F.3d at 81 (2d Cir. 2010)).

Goodwill is damaged when the infringing conduct provides consumers with

a low-quality competing product.  In *WTV Systems*, the court found irreparable

harm to consumer goodwill where the plaintiff's copyrighted works were

rebroadcast without the quality controls put in place by authorized licensees,

creating a "significant risk of damaging customer goodwill as customers become

disillusioned, frustrated, and confused" due to reduced quality.  *Id.* at 1014.  In

*Psystar*, the "decreased functionality and quality" of the infringing derivatives was

found likely to be attributed to the copyright holder, and the consequential harm to

reputation and goodwill likewise supported a finding of irreparable harm.  673 F.

Supp. 2d at 949; *accord Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1173

(7th Cir. 1997) (irreparable harm found where infringing product exhibited

---

[13] *See also Amini Innovation Corp. v. KTY Int'l Mkt'g*, 768 F. Supp. 2d 1049, 1057 (C.D. Cal. 2011) (irreparable harm shown where "the continued sale of [infringing products] … would damage the goodwill in which [plaintiff] has greatly invested"); *Sweet People Apparel, Inc. v. Zipper Clothing*, 2012 WL 1952842, at *3 (C.D. Cal. May 31, 2012) (holding that copyright and trademark infringement would irreparably harm plaintiffs' business, goodwill, and reputation).

"differences in appearance and quality control ... that while not big enough to rebut an inference of copying could impair [the copyright holder's] goodwill").[14]

Here, Defendants' XXX Adaptation will harm the goodwill Plaintiffs have earned with consumers and the goodwill in the Fifty Shades Trilogy and Films generally. The acting, costuming, cinematography, and overall production value of the XXX Adaptation is poor, particularly in comparison to a mainstream feature film release by a major studio like Universal and its Focus Features division. The low quality of the infringing work damages goodwill in the Fifty Shades Trilogy by reflecting poorly on the quality of the source material. In addition, Defendants' crude pornographic portrayal of the erotic elements central to the Fifty Shades Trilogy fails to capture the unique and delicate balance of provocative sex, emotional romance, and self-deprecating humor that has resulted in a worldwide literary phenomenon. For consumers who view the XXX Adaptation in lieu of reading the books or watching the Fifty Shades Films, or for those who simply learn of the Fifty Shades Trilogy's existence in a hardcore porn format, the reputational damage to these already-controversial erotic novels and films is immeasurable and irreparable. *See* Mitchell Decl. ¶¶ 12-13; Brooks Decl. ¶¶ 19-21

Moreover, the XXX Adaptation wrongfully usurps Plaintiffs' right of control over the distribution and presentation of the copyrighted works. FSL chose Universal based on its track record of vision, skill, and expertise in developing bestselling works of fiction for the screen. *See* Mitchell Decl. ¶ 9. Universal, in turn, has placed the Fifty Shades Films in the hands of its prestige films division,

---

[14] Courts also consider a copyright holder's goodwill and reputation with its licensing partners, as well as the right to control to whom works are licensed. In *WTV Systems*, plaintiffs established a likelihood of irreparable harm where defendants' unauthorized rebroadcasts took place during "negotiated exclusivity periods." 824 F. Supp. 2d at 1012. The court reasoned that injunctive relief was the appropriate remedy for this "interfere[nce] with Plaintiffs' grants of exclusivity to their licensees [and] Plaintiffs' relationships, including the goodwill developed with their licensees." *Id.* at 1012; *see also Berster Tech. v. Christmas*, 2012 WL 33031, at *11 (E.D. Cal. Jan. 6, 2012) (infringement that threatens to interfere with licensing results in an "inability to use … intellectual property completely" and is an irreparable harm).

Focus Features, signaling an intent that the forthcoming adaptations be artful, intelligent, and challenging.  *See* Brooks Decl. ¶¶ 3-7.  Defendant's distribution of the XXX Adaptation undermines this legitimate attempt to control FSL's copyrighted works.  Now, the reputation and goodwill of a global literary franchise rest in the hands of a pornographic film company whose other titles include *Private School Nymphos* and *Naughty Office Girls*.  *See* Kohn Decl., Ex. 32.

The XXX Adaptation also impedes Universal's efforts to cultivate goodwill in the Fifty Shades Films in advance of their release.  Universal, which paid valuable consideration for exclusive film rights, is faced with competition from an infringing work before it even concludes production and begins distribution of the authorized films.  Defendants' distribution of an inferior product robs Universal of exclusivity, diminishes public anticipation, and requires Universal and Focus to market the authorized films against the false impressions created by the XXX Adaptation.  *See* Brooks Decl. ¶¶ 17-21.

## 2.   The XXX Adaptation Will Result In Incalculable Lost Profits.

Because lost profits due to copyright infringement are "neither easily calculable, nor easily compensable," this manner of harm is "an appropriate basis for injunctive relief."  *WTV Systems*, 824 F. Supp. 2d at 1013; *accord Salinger*, 607 F.3d at 81 ("to prove the loss of sales due to infringement is ... notoriously difficult") (citations omitted)).  In finding irreparable harm, courts in the Ninth Circuit consider the difficulty in calculating lost sales, *Amini Innovation*, 768 F. Supp. 2d at 1057; lost licensing revenues, *WTV Systems*, 824 F. Supp. 2d at 1013; and lost market share, *Psystar*, 673 F. Supp. 2d at 949.[15]

"Lost sales" includes the substitution not only of the original work, but also authorized derivatives.  In *RDR Books*, the court enjoined a "Lexicon" of J.K.

---

[15] Losses due to disruption of the copyright holder's marketing plan also are a form of irreparable harm.  *Ty*, 132 F.3d at 1173 (maker of "Beanie Babies" limited distribution, creating a high-value secondary market; an infringer's harm to this "scheme of distribution [and] marketing plan cannot readily be monetized" and was thus irreparable).

Rowling's *Harry Potter* universe, which included "considerable verbatim copying" of the language in the novels.  575 F. Supp. 2d at 552.  The court noted that, because the infringing encyclopedia "replicated ... for a similar purpose" not only the protected language of the novels but also the central elements of Rowling's own companion books, "[r]eaders would have no reason to purchase the [authorized] companion books since the Lexicon supersedes their value."  *Id.*

Here, the infringing XXX Adaptation, with its extensive copying, acts as a substitute and will result in lost sales of the Fifty Shades Trilogy and diminished revenues for the Fifty Shades Films.  *See* Mitchell Decl. ¶¶ 14-15; Brooks Decl. ¶¶ 22-23.  The XXX Adaptation also interferes with Universal's marketing strategy, to the detriment of future theatrical and home-entertainment sales. Brooks Decl. ¶¶ 22-23.  All of these harms are difficult, if not impossible, to calculate with any degree of precision, and thus qualify as irreparable.

**C.      The Balance Of Hardships Weighs Decidedly In Favor Of Plaintiffs.**

Defendants "cannot complain of the harm that will befall [them] when properly forced to desist from [their] infringing activities."  *Triad Sys. Corp. v. Southeast Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995); *see also Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997) ("[W]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration ….'") (citation omitted).  The injunction requested by Plaintiffs does not threaten to cause hardship to Defendants' lawful business activities; their sale of other, non-infringing works will continue unimpeded.  *See Sweet People*, 2012 WL 1952842, at *3 (finding no harm to defendants where "an injunction would still allow Defendants to operate their businesses, albeit without the infringing [products]").

**D.     Public Policy Favors The Issuance Of A Preliminary Injunction.**

The Supreme Court has made clear that upholding copyright protection is in the public interest.  *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2003); *see also Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1038 (9th Cir. 1994) ("[P]ublic policy favors the issuance of injunctions in intellectual property infringement lawsuits ….").  Particularly in light of Defendants' blatant infringement, "the public interest is served by issuance of a preliminary injunction, as it is virtually axiomatic that *the public interest can only be served by upholding copyright protections* and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work."  *WTV Sys.*, 824 F. Supp. 2d at 1015 (emphasis added).  By protecting the substantial creative investments of FSL and Universal, preliminary injunctive relief in turn protects the public's interest in preserving "the incentive for original authors to create new works."  *RDR Books*, 575 F. Supp. 2d at 553.[16]

## IV.    CONCLUSION

For the above stated reasons, Plaintiffs respectfully request that the Court enter the proposed preliminary injunction barring the further marketing, sale, or distribution of the XXX Adaptation.

DATED:  January 29, 2013                      JENNER & BLOCK LLP


                                                     /s/Andrew J. Thomas
                                                    Andrew J. Thomas


                                              Attorneys for Plaintiffs
                                              Fifty Shades Limited and
                                              Universal City Studios LLC

---

[16] The security required under Federal Rule of Civil Procedure 65(c) need not be substantial and may be dispensed with entirely where, as here, the plaintiff has a strong likelihood of success on the merits and an injunction would merely preserve the status quo *ante*.  *E.g.*, *California v. Tahoe Regional Planning Comm'n*, 766 F.2d 1319, 1326 (9th Cir. 1985); *Colin ex rel. Colin v. Orange Unified Sch. Dist*, 83 F. Supp. 2d 1135, 1151 (C.D. Cal. 2000).